Next case is Bruno Sinigaglio v. Army Next case is the Department of the Army, 06-3412 It's kind of hard to be the fourth case, isn't it? We're ready when you are, Mr. Hackett. This case involves a single Army charge of sexual harassment against Mr. Sinigaglio The specific charge is that of, quote, sexual harassment not involving a subordinate. The specific conduct occurred at the Biathlon building in Fort William County, Alaska. Some disputed that Mr. Sinigaglio apologized immediately following the single incident. Mr. Sinigaglio testified the incident occurred in August or September of 2003. The complainant testified that the incident occurred in early 2004. Regardless of when the incident occurred, it's undisputed if you take the complainant's date of early 2004 that the complainant did not make a report to her supervisor until May 6, 2005, one and a half years later. If the court looks at the decision of the board, which was accepted as the final decision, The court will see the analysis of the bottom of page 11 and the top of page 12. There are some significant omissions from Mr. Sinigaglio's standpoint. First of all, the board never found that the complainant was a reasonable person. Secondly, the board never found that a reasonable person in the complainant's position would have found her work environment abusive or hostile. Third, the board never found that Mr. Sinigaglio's conduct was sufficiently severe or persuasive as to unreasonably interfere with the complainant's job performance. Your argument basically that because a year and a half, I'm sorry, at least a year passed between the date of the event and when the complaint was made, and there was evidence that during that period the complainant interacted with Mr. Sinigaglio and with her peers and that she seemed to have cordial relations with everyone and so forth, that there's no indication of an abusive work environment. Is that your argument? That's part of it, yes, Your Honor. In Harris v. Forklift Systems, which this court quoted at some length in its 1994 decision of King v. Hillen, it points out that this has to be looked at from the perspective of a reasonable person. What the board found was from the complainant's perspective it may have been abusive to her. The board never looked at the case from the objective standpoint of a reasonable person in the complainant's standpoint. There are significant omissions in the board's case. Justice Scalia, in his concurring opinion in Forklift, said the test is not whether the work has been impaired, that is the complainant's work, but whether the work conditions have been discriminatorily altered. There is no substantial evidence if you look at one of the things, Justice Scalia, you asked about, if you look at the omissions, the glaring omissions in the decision, for example. But your argument really is tied to the time consideration, isn't it, in a sense? It is. For example, if in fact the complaint had been made a week after the event occurred, would you have much of a case on the abusive work environment issue? It would make Mr. Sinegalio's argument more difficult, but you have to look at what actually did occur to answer from an objective standpoint why. Oh, I understand. I mean, the Supreme Court says you have to look at all the circumstances. The board did not look at all the circumstances. Well, I wonder, though, the board, if you go back five pages or so from the point that you were referencing us to on page 11 through 12, the administrative judge runs down the law of sexual harassment and what, as I read it through it, I thought was a pretty comprehensive and accurate statement, including the reference both to the requirements of King and Hillen saying that it has to be both objective and subjective, but that you look at it from the perspective of the victim. That is to say a reasonable person under all the circumstances in the victim's shoes, a subordinate in a situation in which she is subject to the day-to-day control of the accused person. I read, correct me if you think this is a misreading, but I read the summary on 11 through 12 of the pertinent evidence not to be disregarding the test, which the administrative judge had just laid out, but rather just sort of highlighting particular points that demonstrated why that test was satisfied. So it didn't seem to me that once having articulated the test, the administrative judge was required to say, well, here is the evidence and why I hereby find that each element of that test is satisfied. Do you think? Well, we'll all do what is fair. That's a possible and determined conclusion, but one thing that the administrative law judge didn't talk about was when she finally, when the complainant finally made the report, she said that she made the report in May of 2005 because, page 79 of the joint excerpt, because she wasn't going to get her second promotion from G9 to G11, and she thought that Mr. Sinodaly was the reason she did not get her promotion. Yet she then testified in front of the board that her not getting her second promotion was not the reason she made the report. And on page 82 of the joint appendix, the administrative judge said, well, you just testified that your memory was better in May of 2005 than it is today. What the board didn't look at was she received, there is just not substantial evidence from an objective standpoint, that at the time a report was made, among the evidence presented, that, as Justice Scalia said, that her working conditions were discriminatively altered. Right, the same, within a month or two of when she first made the report, not to her supervisor, but in early 2004, she transferred into building 3225 in early 2004. She daily went to the cubicle where a female slosh and a Mr. Sinodaly were located. She used Mr. Sinodaly as a job resource. She touched Mr. Sinodaly with the arm, shoulder, and leaned over in his office. She had significant formal training in February, March, April of 2004, pages 55 and 57 of the joint appendix. Her supervisor, Mr. Solomon, said that she received greater or equal training than 10 out of 17 QARs. In June 2004, a year later, she was promoted from GS7 to GS9. Her supervisor, Mr. Salmon, said the goal was to make sure every person is successful, whatever that takes. Mr. Hackett, are you saying that the conduct described, in which he put her down on the floor and got on top of her and tried to kiss her, was not objectively unreasonable in creating an unreasonable work environment? And it was only a subjective view of her? No, no. I'm not. It was objectively. It falls under that. But my point is that it has to be significantly severe, because talking about the law and the case. And the conduct described here was not sufficiently severe? Was not severe in context, no. Because basically, if you look at what happened thereafter, she brought her dog to work with her. She was working. A significant part of the complainant's work was with another project engineer, Mr. Glenn Zahn, the complainant. That's at page 51 of the joint excerpt. At page 99 of the joint excerpt, the complainant was assigned her own four-wheel drive vehicle. She was a 26-year government employee. At pages 67 and 68 of the joint appendix, she had received sexual harassment training, and she knew that she was required to report promptly, and she did not. Your position, Mr. Hackett, is that, I mean, the record shows there really isn't much dispute between Ms. Lowry's version of this event and Mr. Sinigallio's. I mean, you can, you know, basically, there's not a dispute as to what physically happened at the Biathlon Center. Your argument is that whatever was the severity of that event, we have to conclude that it did not create an abusive work environment, given the series of events that unfolded during the period following the event up until the complaint.  Well, that is my argument, and certainly it's part of the argument. And if you look at it, to show that – to show that – and by the way, the Farragher case is cited by the administrative judge to say when there's one single incident, it has to be extremely serious and extremely severe. Mr. Sinigallio, when it's on dispute, on page 5 of the transcript, immediately apologized whether you take his version of the events or if you take the complainant's version of the events. And if you go to page 90 of the joint appendix, Ms. Lynette Bouchard, who was the first person the complainant talked to about this, and I think January 12th of 2004, basically then checked in with the complainant during the rest of that year, 2004. And according to Ms. Bouchard, she quotes the complainant, page 90 of the joint appendix. I had – this is quoting Ms. Bouchard – I had conversations with her. That's the complainant about previously, you know, how's it going? You doing okay? You know any problems with it? And she, like every few months, and she talking about the complainant, you know, saying no, no, no, he's working with me. He's very professional. Things are going on. So there are admissions by the complainant to her friend during the course of 2004. Ms. Bouchard was transferred to Anchorage in 2005 that he, Mr. Sinegalia, was working with her. They quote he's very professional and things are going on. And so there is an acknowledgment by the complainant shortly after her initial report, well before she reports to the supervisor, that Mr. Sinegalia was acting very professionally. Let me ask you this. In a sexual harassment type case where we're focused on the effect on the working environment for the victim, how long does there have to be an adverse effect on the working environment before you have an actionable sexual harassment? Suppose, in other words, to take the facts of this case, for two weeks things were very tough for her and would have been, let's say arguably, for anyone in that situation, but after the two weeks, you know, one gets over things over time, and if there was no repeat performance, gradually things settle down. That would still be sexual harassment, wouldn't it be? It's just for a two-week period rather than for a two-year period. Well, again, all I can do is quote things. Well, I actually don't want you to specifically quote. I want a more general answer to the question of whether you can have a sexual harassment for a short period of time that is actionable even if later it turns out that things sort of work themselves out between the people. While it sounds reasonable on its face, the case law seems to say it has to be sufficiently severe so as not to turn Title VII into a general civility code. Well, I understand that, but I think that at least what happened here seems to me to go beyond a lack of civility. If a person could reasonably react for a period of time, let's say my two weeks, by finding the environment to be made very much more difficult at work, would that satisfy sexual harassment even if it didn't continue for the entire tenure, the person's entire tenure in the job? I guess arguably it could, but each case has to be looked at on the facts. In this case, we know that the complainant got on-the-job training with Ms. Lowery and Mr. Illichman, both of whom were training her. She said that she seemed to be working nicely with them. When Mr. Sinigalio was talked to by Mr. Illichman in January of 2004, Mr. Sinigalio promised – he went to page 96 of the Joint Appendix – he wouldn't be alone with the complainant. They would take separate vehicles, and Mr. Sinigalio would act professionally. He promised Mr. Illichman, help the complainant finish her training, which in fact he did. Mr. Sinigalio was tasked because he was a job resource. He has 30 years with the government. He's a great asset in terms of job knowledge, and everyone – the record is uniform that he is a wonderful resource to give of his time and of his expertise to everyone. They don't have any assigned mentors or training officers. Mr. Sinigalio fell to him. And we have Major Schlosser, Theresa Schlosser, who appeared telephonically from Afghanistan. She said she just had never dealt with someone bursting into tears on a regular basis like the complainant, who was on Prozac since 1995. You can't look at this case in isolation. The complainant worked it out, and then she waited when she didn't get her second promotion, which she finally did get, and then made a report. If you look at the totality, this is just not sufficiently severe. Thank you. Mr. Hackett, your time is up, and we'll give you two minutes rebuttal time. Ms. Stern. Good afternoon, Your Honor. As we understand Mr. Sinigalio's argument today is that the board erred by failing to consider the totality of the circumstances in finding Mr. Sinigalio's conduct to create an abusive environment. In particular, he argues that the board failed to consider the fact that Ms. Lowry was able to work and perform relatively satisfactorily following this conduct. In response to that argument, we first make two points. The first one is, as Judge Bryson suggests reasonably, I think, the fact that Ms. Lowry may have at some later point worked things out to the point where she was able to perform satisfactorily doesn't mean that for some period of time after this conduct occurred, her environment was hostile and abusive, both subjectively and objectively, and that alone would be sufficient to find sexual harassment. Ms. Stern, let me ask you, do you think the timing of the complaint, and I'm going to speak generally here, can ever be a factor? For example, Mr. Hackett acknowledged, I mean, his argument is that the fact that the complainant waited a year suggested that there wasn't an abusive work environment. He acknowledged, however, I think, that he'd have a difficult case if a complaint had been lodged, say, a week after this incident at the Biathlon Center. But assume for the moment you had a situation where someone waited four years. Does a point come where, notwithstanding the colloquy between Judge Bryson and Mr. Hackett, where the complaint is lodged so long after the incident that one has to conclude that it's difficult to show an abusive work environment? I realize that's not the case here, but assume for that moment. I mean, is there a time cutoff at some point? I would say no, Your Honor, because that would be only one factor. And that factor alone, Your Honor, would not ever be sufficient in and of itself to suggest that the conduct was not sufficiently severe to create a hostile work environment. In Hillen, this Court specifically said that satisfactory work performance by the complainant following the conduct should not be used to denigrate the concerns of the individual. So while it might be one factor, that factor alone would never be in and of itself sufficient. But it would make a more difficult case for the government if you had a situation, an incident just like this, and then, say, four or five years later, a complaint is made, and in the interim, there are no indications of a problem. It certainly could, given the facts of the specific case where there was no other explanation about why, for example, the individual waited so long. In this case, where, of course, the length of time wasn't quite as long as hypothetically suggested, Ms. Lowery went on to explain why she didn't go ahead and articulate her concerns earlier. She had some concerns about making waves and being subjected to the kind of embarrassing questioning that she found herself subjected to during the hearing, and that was one of the reasons that she didn't go ahead. But she did, and I think this weighs on the other side. Although she did wait before she went to complain through official channels, she complained very soon after the incident to some colleagues, telling them how upset she was and bursting into tears when telling them how upset she was about the details of the incident. And so it isn't – I think it wouldn't be fair to just say that she waited a year to report this without recognizing that she, in fact, did report it relatively quickly to at least some colleagues, if not through the official channels. One question, just a clarification. In the – I guess it's page one attached to the government brief. There's a copy, I think, of her complaint. And the main focus is on the March 8, 2004 incident at the Biathlon Building, but there are references above that to other incidents or another additional conduct. But I assume that the only thing that was really litigated here was the incident at the Biathlon Building. Yes, and that's because that's the only incident that was included in the notice of proposed suspension, and therefore the administrative judge limited testimony, in fact, to that incident. With respect to the totality of the circumstances, the Supreme Court has, of course, spoken to this issue and has on occasion mentioned a number of factors that the board and the court can look at to determine whether or not the conduct creates a hostile and abusive environment. And included in these factors would be the severity of the conduct, whether it's physically threatening or humiliating, and whether it interferes with the employee's work performance. In this case, it's clear from a careful review of the administrative judge's decision that he examined several of these factors. He looked at the severity of the conduct. He looked and determined that it was physically humiliating, that it involved physical contact. We don't need to, I guess, revisit what happened in this case. I think everyone's very aware of that. But this was, needless to say, no mere verbal utterance. This goes way beyond mere incivility. It was a physical attack. Sexual battery, I suppose, is what it would be if it were a crime. If it were charged, it's a crime. It is a crime. With respect, the administrative judge also looked to see whether there was interference with the work environment. Ms. Lowery had testified that she was afraid to be alone with Mr. Sinagoglio. But, of course, her position required her at times to be alone with him. She testified that she wanted to quit the job, that she was not even looking forward to coming to work. The administrative judge looked at the psychological harm. That's not a required factor. We know the Supreme Court has said it doesn't have to be evidence of psychological harm. It's also said that you can't look at that as one factor. And Ms. Lowery had testified that, although she had taken Prozac before this incident from time to time, that she increased her incidence of taking it, that she was very depressed, so she was psychologically affected. The administrative judge did consider Mr. Sinagoglio's claims concerning Ms. Lowery's work performance after this incident. The fact that she continued to visit him at his work cubicle, email him. But the administrative judge weighed all of the evidence and found that even despite Mr. Sinagoglio's evidence, that the conduct was severe enough to constitute sexual harassment. And really what this case boils down to is Mr. Sinagoglio's disagreement with the way in which the administrative judge weighed that evidence in this case. I'm sorry, go ahead. Was there any reason, I'm kind of curious, whether there was nothing in the agency's penalty table or whatnot that would have, well, substituted for the charge of sexual harassment, something that was more directly pointed at the specific conduct, such as a charge of sexual battery or whatever. It's a kind of roundabout way of getting at what really happened, you would think. The natural charge would be that there was a single incident of serious battery of a sexual nature. The agency did have regulations that spoke to sexual harassment, and they referenced them in the decision letter, but not in the notice of proposed suspension. And therefore, in the initial decision, the administrative judge specifically addressed the issue of whether this was a case of violating an agency regulation dealing with sexual harassment or violating Title VII, and found that because the agency hadn't referenced their own regulation in the notice of proposed suspension, it was only fair to treat it as a Title VII violation. And that was the way in which Mr. Sinagoglio had responded to the notice of proposed suspension, as if he was being charged with a violation of Title VII, and therefore it would only be fair in keeping the due process to analyze the charges on that basis. For all of those reasons, and for those cited in our briefing, we urge the court to approve the decision letter. Thank you, Your Honor. Thank you, Ms. Duren. Mr. Hackett, we'll give you two minutes rebuttal. Thank you. In terms of assessing the severity of the incident, I would point out to the court that Mr. Kohlenbarger also was a witness. And Mr. Kohlenbarger, in January of 2004, the complainant made a report to him saying that the incident occurred at the Deluge Building, Building 1909, and said that Mr. Sinagoglio tried to kiss her three times, and on the third occasion, he stopped. So the point in that report was made to Mr. Kohlenbarger. He's included in the joint appendix right about the same time as she made the report to the other two people. So in terms of the severity of the incident and objective severity, the complainant told the second witness about the same time in January. And by the way, her testimony is that it occurred in February or March of 2004. That's what she testified to in front of the hearing officer, which obviously is two or three months after she made the report to Ms. Buschall, an inconsistent report to Mr. Kohlenbarger. The complainant admitted in her testimony at pages 70 and 71 of the joint appendix that Mr. Sinagoglio, in 2004, supported her as a primary QAR on the NP Warm Storage Project from June to December of 2004. So Mr. Sinagoglio, doing what he was supposed to do, based upon their joint supervisor's request, was supportive of her. The complainant acknowledged that he was acting professionally and was supportive of her at page 90 of the joint appendix, where Ms. Buschall, who was there during 2004 before transferring in 2005 to Anchorage, quotes Ms. Lowery, talking to her every several months, saying, no, he's working with me, he's very professional. So Mr. Sinagoglio, thereafter, was very professional towards the complainant. Thank you, Mr. Hackett. Case to be taken under advisement. The Honorable Court is adjourned from day to day.